## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**K.MIZRA LLC,**

               **Plaintiff,**

**v.**                                  **Case No: 6:21-cv-1293-PGB-EJK**

**TOSHIBA TEC CORPORATION
and TOSHIBA AMERICA
BUSINESS SOLUTIONS, INC.,**

               **Defendants.**

_____/

## <u>ORDER</u>

This cause comes before the Court on the Plaintiff's Motion for Claim Construction (Doc. 60) and the Defendants' Responsive Brief (Doc. 61). The Court held a *Markman* hearing on August 19, 2022. (Doc. 64).

## I.    BACKGROUND

Plaintiff K.Mizra is a patent licensing company holding portfolios developed by numerous manufacturers. (Doc. 39, ¶ 5). Sharp Corporation transferred its multifunction printer ("**MFP**") focused patents to the Plaintiff, and the Plaintiff brought this lawsuit to enforce its patent rights against the defendants. (*Id.* ¶¶ 1–6). The Plaintiff moves the Court for an Order construing claim terms appearing in the following patents: U.S. Patent No. 6,150,063, U.S. Patent No. 7,064,874, U.S. Patent No. 7,570,400, U.S. Patent No. 8,274,711, and U.S. Patent 10,018,938. (Doc. 62-1). The parties notified the Court that Plaintiff K.Mizra will not assert the '983

Patent against Defendants now or in the future and dismisses this action as to the '983 Patent with prejudice. (Doc. 66).

## II.   LEGAL STANDARDS

The Court construes a patent claim as a matter of law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc). The Federal Circuit directs district courts construing claim terms to focus on the intrinsic evidence–that is, the claims, specification, and prosecution histories–because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language."[1] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Generally, the Court accords the words of a claim "their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. Persons of ordinary skill in the art do not read the claim term in isolation, but in the context of the entire patent. *Id.* at 1313. If the ordinary meaning of claim language is "readily apparent even to lay judges," then claim construction requires "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. But because the meaning of a claim term as understood by a person skilled in the art is often not

---

[1]   The patent's specification is "the single best guide to the meaning of a disputed term," as it may reveal that the patentee intended a special definition to apply to a claim term that differs from its ordinary meaning or that the patentee intentionally disclaimed or disavowed the claim's scope. *Phillips*, 415 F.3d at 1315–16 (internal quotation marks omitted).

immediately apparent, the Court looks to both intrinsic evidence (the words of the claims themselves, the specification, and the prosecution history) and extrinsic evidence (sources such as dictionaries and expert testimony). *Id.*; *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008).

Several other principles guide the Court's construction of claim terms. First, the Court presumes that the same terms appearing in different portions of the claims have the same meaning, unless the specification and prosecution history clearly demonstrate otherwise. *Fin. Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001). While the "[i]nterpretation of a disputed claim term requires reference to the other claims," *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999) ), "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). Courts are further cautioned that "a construction that renders the claimed invention inoperable should be viewed with extreme skepticism." *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002) (citation omitted), *vacated and remanded on other grounds*, 537 U.S. 802 (2002).

Finally, district courts have an obligation to construe terms when it is necessary to resolve a genuine and material legal dispute between the parties. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008); *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1219 (Fed. Cir.

2007) ("[A]ny articulated definition of a claim term ultimately must relate to the infringement questions that it is intended to answer."). The party requesting the Court to construe a claim term must demonstrate that the construction is both necessary and correct; that is, construction of the claim term must be fundamental to issues of infringement or invalidity, and the Court may not issue an advisory opinion. *IP Cleaning S.p.A. v. Annovi Reverberi S.p.A.*, No. 08-cv-147-bbc, 2008 U.S. Dist. LEXIS 102312, at *3 (W.D. Wisc. Dec. 17, 2008).

## III.   AGREED TERMS

The parties have reached agreement as to the proper construction of the following terms:[2]

| Claim Term | Agreed Construction |
|---|---|
| "flexible sheet"<br><br>'400 Patent, Claim 1 | "a sheet that is so elastic as to be easily deformed by an external force" |
| "first and second light sources are separately driven"<br><br>'874 Patent, Claim 17 | "first and second light sources are turned on and off by separate circuits" |
| "wherein the document holder is fixed at portions other than a portion that is positioned immediately below the pivot axis, to the bottom surface of the document reading device"<br><br>'400 Patent, Claim 1 | "wherein the document holder is fixed at two or more portions, none of which is positioned immediately below the pivot axis, to the bottom surface of the document reading device" |

---

[2]   *See* Doc. 62-2, Ex. B.

## IV.   COURT'S CONSTRUCTION OF DISPUTED TERMS

The parties have identified five (5) disputed claim terms. (Doc. 62-1). The Court will address the disputed claim terms in the order presented by the parties at the *Markman* hearing.

### A.   "of at least 5.6 eV"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "of at least 5.6 eV"[3]<br><br>'063 Patent, Claim 1 | "of at least 5.6 eV to one decimal place as measured by a surface analyzer AC-1 or an equivalent measurement method" | "not less than 5.6 eV" |

#### 1.   *Plaintiff's Position*

The '063 Patent relates to an electrophotographic photoconductor. (Doc. 74, 9:22–25). The patent teaches the minimum ionization potential; that is, the amount of energy necessary to generate the electric charge arising in the photoconductor which attracts toner in a particular pattern corresponding to the image of the copy. (*Id.* 10:1–6; Doc. 60, p. 6). The Plaintiff advocates in its proposed construction of the term "of at least 5.6 eV" that it should be construed to mean at least 5.6 electron volts to one decimal place measured by a surface analyzer AC-1 or an equivalent measurement method. (Doc. 74, 10:7–17). The Plaintiff argues that the plain and ordinary meaning in the scientific,

---

[3]   The term "eV" stands for electron-volt; that is, the amount of energy required to move an electron through it, the voltage differential of 1 volt. (Doc. 74, 8:19-21).

mathematical, engineering world is that "5.6 eV" would be 5.55 to 5.64 eV. (*Id.* 11:5–12). The Plaintiff also submits that the plain and ordinary meaning of a particular value includes rounding unless the intrinsic evidence renders it inappropriate to do so. (*Id.* 11:16–19; Doc. 60, pp. 6–7).[4] Accordingly, the claim should be construed to require no more precision than the ionization potential value to one decimal place (i.e., "at least 5.6"). (Doc. 60, p. 6). The Plaintiff concedes that "the specification does recite certain ionization potentials with two decimal places instead of one, [but] at no point does the specification indicate that an ionization potential between 5.55 eV and 5.60 eV is unsuitable." (*Id.* at p. 8). Accordingly, the Plaintiff argues that any measurement above 5.55 eV would meet the 5.6 limitation. (Doc. 74, 14:19–20).

Next, the Plaintiff urges the Court to adopt a construction that construes the claim to require that the ionization potential is measured using a surface analyzer AC-1, which is a product of Riken Keiki K.K., or an equivalent method. (Doc. 60, p. 9). The Plaintiff argued the claim should be construed to require that measurements are conducted with a surface analyzer AC-1 or an equivalent method to ensure the experts are using the same equivalent methodology to

---

[4] The Plaintiff cites *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1328 (Fed. Cir. 2021) where the claim specified "PVP K25 [being] present at a concentration of 0.001% w/w." The district court construed this to encompass a concentration of PVP in the range of 0.0005% to 0.0014%. *Id.* at 1329. The Federal Circuit construed 0.001% "as that precise number, with only minor variations, i.e., 0.00095% to 0.00104%." *Id.* The Court reached this construction, in part, because the written description and prosecution history place "considerable emphasis on the stability of the claimed formulations." *Id.* That said, the Court acknowledged that the term "0.001%" used as a single significant figure would encompass a range from 0.0005% to 0.0014%. *Id.*

measure the value; otherwise, the jury will be required to decide which methodology is the most reliable. (Doc. 74, 17:6–10). The Plaintiff supports this construction by citing several district courts which have construed claims to require measurement by the specific method disclosed in the specification.

## 2. *Defendants' Position*

Claim 1 of the '063 Patent teaches the "charge generation layer has an ionization potential of *at least* 5.6 eV." (Doc. 39-10, 17:7–8) (emphasis added). And so, the Defendants submit the term "of at least 5.6 eV" should be construed as "not less than 5.6 eV," because the term "at least" unambiguously conveys "an absolute lower limit of a range." (Doc. 61, p. 3). Stated differently, the Defendants submit the term "at least" means "as the minimum" or a range with a defined lower limit. (*Id.*). *See Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1581 (Fed. Cir. 1995) (holding "at least" means "as the minimum"); *Genes Indus., Inc., v. Advanced Components Specialist, Inc.*, No. SACV 04-0408, 2005 WL 6287758, at *3 (C.D. Cal. June 22, 2005) (the "ordinary, common usage" of "at least" is synonymous with "'no less than' . . . or 'at a minimum'"). The Defendants claim the inventor's objective was to provide a charge generation layer "having a large ionization potential" and so the summary of the invention calls for "the charge generation layer [having] an ionization potential of at least 5.6 eV." (Doc. 61, p. 4 (citing Doc. 39-10, 3:38–51)). To illustrate this point, the Defendants direct the Court to the '063 Patent, column 3, lines 1 through 18, where the patent explains that an ionization potential of the charge transfer layer that is about 5.2 to about 5.6 eV

makes it difficult to secure the potential contrast necessary for the invention to function as intended. (Doc. 74, 23:10–23). Thus, the present invention set 5.6 eV as the minimum. (*Id.* 23:24—24:3).

The Defendants further argue that in construing claims, the "analytical focus must begin and remain centered on the language of the claims themselves." *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); (Doc. 61, p. 4). In the '063 Patent every example describing the invention teaches an ionization potential greater than 5.6 eV measured to two decimal places without rounding. (Doc. 39–10, 13:6–7) ("The ionization potential of this charge generation layer was 5.65 eV"); (*Id.* 13:64–65) ("When the ionization potential of this charge generation layer was measured, it was 5.63 eV"); (*id.* 14:39–40) ("When the ionization potential of this charge generation layer was measured, it was 5.61 eV"). Moreover, the Defendants emphasize that the repeated use of this "present invention" limits the scope of the invention.[5] *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (Doc. 61, p. 5). The Defendants contend this analysis is not affected by the single instance in the specification which describes the ionization potential as "at least *about* 5.6 eV." (*Id.* at p. 6; *see* Doc. 39-10, 5:3–7). This is because the claim language controls and not the specification. *See Becton, Dickinson & Co., v. Tyco Healthcare Grp.*, 616 F.3d 1240, 1254 (Fed. Cir. 2010).

---

[5] The "present invention provides an electrophotographic photoconductor . . . wherein the charge generation later has an ionization potential of at least 5.6 eV." (Doc. 39-10, 3:44–45).

Finally, the Defendants argue the Plaintiff is improperly trying to limit the method of measuring the ionization potential to the AC-1 or an equivalent measurement method. (Doc. 61, p. 8). The Federal Circuit has cautioned trial courts against limiting the claimed invention to the specific examples in the specification. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). Hence, the Defendants contend the Plaintiff's construction "epitomizes the 'cardinal sin' of importing a limitation from the specification into the claim." (Doc. 61, p. 8).

### 3.   *The Court's Finding*

The Court agrees with the Defendants that the claim language clearly sets 5.6 eV as a minimum value. The '063 Patent employs the limiting language "at least" which means "not less than" or "at a minimum." The Court rejects Plaintiff's argument that the plain and ordinary meaning in the scientific, mathematical, engineering world 5.6 eV would be 5.55 to 5.64 eV. The Plaintiff's construction is contrary to the unambiguous language of the claim, and the intrinsic evidence supports the 5.6 eV minimum value, because the Patent teaches that an ionization potential of the charge transfer layer which is about 5.2 to about 5.6 eV is too small. Moreover, as the Defendants noted during the *Markman* hearing, if the Court construed the claim to include about 5.2 to about 5.6 eV, the claim would be invalidated based on prior art. (Doc. 74, 26:22—27:3).  The Court acknowledges the specification on one occasion teaches "an ionization potential of at least *about* 5.6 eV." (Doc. 39-10, 5:5–6). That said, the Defendants are correct that the claim

language and not the specification controls, and the claim language is unambiguous. The Court also recognizes the case law cited by the Plaintiff and standing for the proposition that absent contrary evidence in the intrinsic record, rounding is permitted for a claimed value. However, the intrinsic record is not silent here and teaches the claim has set a minimum value of 5.6 eV.

The Court also agrees with the Defendants that the Plaintiff's proposed construction improperly imports a limitation into the claim by advancing a construction requiring the value to be measured by the AC-1 or an equivalent measurement method. It is undisputed that the AC-1 analyzer is 20-year-old technology and is no longer available, (Doc. 74, 30:16–19), which may have motivated the "or equivalent measurement method" language in Plaintiff's construction. Neither the claim nor the specifications state no other instrument can properly measure the claimed value. The Court will not read into the claim a limitation that does not exist. Should the Plaintiff believe the Defendants are employing an unreliable measurement method, a motion in limine or *Daubert* challenge is an option. For these reasons, the Court adopts the Defendants' proposed construction of the Claim Term "at least 5.6 eV" to mean "not less than 5.6 eV."

### B.   "reading portion"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "reading portion" | Plain and ordinary meaning; no construction necessary. Alternatively, "a section of a | This term is indefinite and fails to satisfy the |

| | | |
|---|---|---|
| '874 Patent, Claim 9, 18 | document scanning machine that converts the document image into electrical signals." | requirements of 35 U.S.C. § 112 |

### 1. *Plaintiff's Position*

In a somewhat unconventional approach, the Defendants do not submit a proposed construction for the term "reading portion," appearing in Claims 9 and 18. Rather, the Defendants argue the claim is indefinite and fails to satisfy the requirements of 35 U.S.C. § 112. (Doc. 53, p. 3; Doc. 61, p. 11). Accordingly, the Plaintiff responds to the indefiniteness argument and offers a proposed construction for "reading portion."

The specification teaches that:

> [t]he present invention provides a both-side document reading method comprising the steps of: illuminating a first surface of the document with light from a first light source to read an image on the first surface; and illuminating a second surface of the document with light from a second light source to read an image on the second surface.

(Doc. 39-1, 4:32–38). The specification identifies the two surfaces in Figure 1. (*Id.* 6:4–13; 7:38–47). Claim 9 of the '874 Patent instructs that the present invention is:

> A both-side document reading apparatus comprising: a first reading portion, provided with a first light source, for reading one side surface of a document by emitting light towards the one side surface of the document by the first light source; and
>
> a second reading portion, provided with a second light source, for reading another side surface of the document by emitting light toward the other side surface of the document by the second light source,

...

(Doc. 39-10, 14:63—15:4). And Claim 18 describes "[a]n image forming apparatus comprising a both-side document reading apparatus" with the first and second reading portions defined as seen in Claim 9. (*Id.* 16:21—40).

The Plaintiff acknowledges the Defendants' argument that the phrase "reading portion" does not appear in the specification, and counters that *in haec verba* recitations of every claim element is not required to appear in the specification. (Doc. 74, 34:20—24). The Plaintiff submits that "a person of ordinary skill in the art can simply read this claim and figure out what the invention is and is not." (*Id.* 36:15—17). The Plaintiff also points to the Office Action Response, dated January 27, 2006, (Doc. 60-6), where the patentee gave an example of "reading portion" during the prosecution of the '874 Patent. (Doc. 60, p. 12). Based on the claim language, the specification, embodiments, and Office Action Response, the Plaintiff argues the Defendants failed to carry its burden of proving indefiniteness by clear and convincing evidence. (*Id.*); *see, e.g.*, *ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, No. 2021-1517, ____ F.4th ____, 2022 WL 1752627, at *2 (Fed. Cir. June 1, 2022) (holding a term is definite when a person of ordinary skill in the art would understand the term to include the specification's example patterns).

2.   *Defendants' Position*

The Defendants contend Claims 9 and 18 do not provide the public with clear notice of the metes and bounds of the claim. (Doc. 74, 42:14—17). The Defendants

argue the word "portion" is a nonce word, or a space filler, and does not connote structure. (*Id.* 42:24—43:11). Furthermore, the Defendants aver that Claims 9 and 18 discuss a reading portion encompassing the reading region, whereas Claim 1 provides for a reading portion subsumed within the reading region—the exact opposite.[6] (*Id.* 45:3–14). The Defendants also assert that adopting Plaintiff's construction of "reading portion" is inconsistent with Claim 14, dependent from Claim 9, because Claim 14 requires the document transport roller to be upstream of the first reading region and "element 68" is downstream. (*Id.* 50:21—51:9).

### 3.    *Plaintiff's Rebuttal*

In rebuttal, the Plaintiff correctly notes the Defendants' argument concerning Claim 14 was not briefed and is, therefore, improper. (*Id.* 52:22–24). Additionally, the Plaintiff submits Claim 18 does not require the reading region to be inside the reading portion. (*Id.* 52:10–19). Rather, the reading region is only associated with where the reading is occurring with the paper. (*Id.* 52:19–21).

### 1.    *The Court's Finding*

The Court finds the Defendants have failed to carry its burden of proof that Claims 9 and 18 are indefinite. The subject invention is far from complex, and a person of ordinary skill in the art possessed of the Office Action Response, claim language, specification, and embodiments would understand the metes and

---

[6]   During the *Markman* hearing, the Defendants conceded that the invention is simple and calls for light being emitted onto paper to interact with toner to reproduce words or images on both sides of the page, but the Defendants argued the claim does not specify the specific hardware for accomplishing those tasks. (Doc. 74, 47:6–15).

bounds of "reading portion." That said, since "portion" is a nonce word, and to assuage the Defendants' objection that one skilled in the art may harbor some confusion over where the reading portion resides, the term "reading portion" should be construed. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("when the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). The Court adopts the construction proposed by the Plaintiff, and the term "reading portion" shall be construed to mean, "a section of a document scanning machine that converts the document image into electrical signals."

### C.    "document reading device"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "document reading device"<br><br>'400 Patent, Claim 1 | Plain and ordinary meaning; no construction necessary. Alternatively, "a device capable of converting the image of an original document which rests upon a flat plate into electrical signals." | "An automatic document feeder configured to read an image of an original document placed on a document platen." |

#### 1.    *The Dispute*

The disputed over this term is narrow: the Defendants propose a construction limiting the term to "an automatic document feeder" ("**ADR**"), and the Plaintiff contends it has not by lexicography limited the claim to an ADR.[7] (Doc.

---

7    The Defendants did not raise a disclaimer or disavowal defense. (Doc. 74, 56:20–21).

60, pp. 14–16; Doc. 74, 56:3–7). The Defendants assert the document reading device is an ADR, because the specification describes a device in which stacked documents are transported through a document reading area to an output tray by "automatically" feeding them via "feeding rollers." (Doc. 61, p. 17). The Defendants also cite the specification where it informs the "transport rollers for transporting an original document on the document transport path" does so at "a predetermined speed." (*Id.* (citing Doc. 39-3, 4:55–57)).

The Plaintiff responds that the specification does not teach that the functionality and the embodiment examples can only be performed by an ADR, and the phrase automatic document feeder does not appear in the specification. (Doc. 74, 56:23—57:7). And lexicography "by implication" requires that the patentee "uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning." *See Bell Atl. Network Servs., Inc. v. Covad Comm'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001). Even so, as the Defendants note, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The Defendants argued, convincingly, at the *Markman* hearing that the claim language requires the document reading device to have a document tray, output tray, a document transport path, and a movable member. (Doc. 74, 60:13–15). The document is then transported along that path at a predetermined speed at a predetermined time. (*Id.* 60:16–20). Thus, the claim

language and specification teach an automatic document feeder" as opposed to somebody placing sheets of paper onto the glass of a copy machine. (*Id.* 60:21–24).

2.   *The Court's Finding*

The Court finds the Defendants have carried its burden of proving the term "document reading device" requires an automatic document feeder. The Defendants argue, and the Court agrees, that the claim when viewed with consideration of the specification and embodiments most naturally aligns with the patent's description of the invention and requires and automatic document feeder. While the claim and specification do not use the term automatic document feeder, the entire invention is premised on exactly that. The Plaintiff's proposed construction ignores the Field of Classification with 358/498 as the primary class and 399/367 as the secondary class, and both classifications further support the Defendants' proposed construction.

Accordingly, the term "document reading device" shall be construed to mean "an automatic document feeder configured to read and convert the image of an original document which rests upon a flat plate into electrical signals."

**D.   "a second document detector for detecting the another document set on the second document table and document detector"**

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "a second document detector for detecting the | The phrase "document detector" should be construed as "device that can detect the presence of a | "a second document sensor capable of identifying the existence of the another document set on the second |

| another document set on the second document table"<br><br>'711 Patent, Claim 1 | document." The remainder of the term does not require construction and should be afforded its plain and ordinary meaning. | document table, detecting the size of the another document, and detecting whether the another document extends beyond the second document table." |
|---|---|---|
| "document detector"<br><br>Claims 1, 2, 11 | "device that can detect the presence of a document" | The term "document detector" is inappropriate for construction in isolation because the claims recite both a first document detector and second document detector, which have different structures and functionality. Rather, only the term "a second document detector for detecting the another document set on the second document table" requires construction as described above. |

### 1. *Plaintiff's Position*

The Plaintiff contends that the "sole dispute between the parties is whether Toshiba has met its burden to prove that the claimed 'document detector' has been limited through lexicography, disclaimer or disavowal to" its preferred construction. (Doc. 60, p. 17). The Plaintiff objects to the Defendants' proposed construction because it improperly limits the scope of the patent, because the only function required of a document detector is to detect the "presence" of a document. (*Id.* at p. 18). That is, Claim 1 teaches a document reading apparatus is comprised of an automatic document feeder that conveys at least one document, and a first

document detector detects the document on the first document table, and the second document detector detects another document on the second document table. (Doc. 60-4, 10:5–16). Contrary to the Defendants' proposed construction, Claim 1 does not mention detecting the "size" of a document or whether it extends beyond the document table. (Doc. 60, p. 18). Claim 1 is thus limited to detecting the *presence* of a document.

Accordingly, the Plaintiff argues the Defendants mistakenly cite limitations found in the dependent claims to limit the independent claim. (*Id.* at p. 19). The dependent claims at issue teach that the second document detector can detect when a document extends beyond the document table; that is, the *size* and *location* of a document.[8] (*Id.*). Claim 1, the sole independent claim, provides that the document detector need only detect the *presence* of the document, thereby supporting the Plaintiff's argument that the Defendants improperly import a limitation from the dependent claims into the independent claim. *See Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1306 (Fed. Cir. 2015) ("[I]t would be improper to import a claim limitation from a dependent claim into an independent claim.").

2. *Defendants' Position*

The Defendants submit that the "claims" — meaning the single independent claim and the dependent claims — recite two separate document devices "that are

---

[8]   37 C.F.R. § 1.75(c) explains that one or more claims may be presented in dependent form, referring back to and further limiting another claim or claims in the same application.

not coextensive in scope." (Doc. 61, p. 19). Where the Plaintiff's proposed construction focuses on the term "document detector," the Defendants argue the issue is how the Court should construe "second document detector," because the term "document detector" ignores the differences in the claimed capabilities of the "second document detector." (*Id.*).  The Defendants frame the issue, therefore, as whether the second document detector must possess the capability to do more than merely detect whether a document is present. (*Id.*). In support of its proposed construction, the Defendants cite Claim 2 — a dependent claim — which provides:

> The document reading apparatus according to claim 1, wherein when the fact that the another document is set extending beyond the second document table is detected by the second document detector, the automatic document feeder is prohibited from operating.

(Doc. 60-4, 10:29–33).

The Defendants further assert that because dependent claims 2 and 11 do not introduce new hardware elements and do not indicate that the second document detector is enhanced or improved, the two "uses" of the second document detector identified in claims 2 and 11 are inherent to the detector's existing capabilities. (Doc. 61, p. 21). This leads the Defendants to the following observation:

> Because all three claimed functions are performed by the same mechanical element [i.e., the second document detector], but the mechanical element itself remains unchanged in the claims, the only reasonable interpretation is that the mechanical element must be capable of all functions claimed in this group of claims, even if not all functions need to actually be performed in each of the three claims.

(*Id.*).

The Defendants support its interpretation of claims 1, 2, and 11 by reference to the prosecution history. (*Id.*). The Defendants argue that "the examiner" referenced "Kazuhiro" describing a "second document detector" for detecting "a document set on the second document table" and referenced "Matsuo" which discloses sensors that detect both the "presence" of the document and the "size" of the document, including whether the document extends beyond the second document table. (*Id.*). Thus, the Defendants contend, "the same 'second document detector' must have the capability of performing all three functions." (*Id.* at p. 22).

Accordingly, the Defendants propose a construction of the "second document detector" that both identifies the presence or "existence" of the document on the second document table, and the size of the document. That is, whether the document resting on the second document table extends beyond it.

### 3.   *The Court's Finding*

It is axiomatic that limitations found in the dependent claims cannot be imported into the claim upon which they depend, thereby modifying the independent claim. *Kaneka Corp.*, 790 F.3d at 1306. Claim 1 clearly informs a document reading apparatus comprising a first document detector capable of "detecting the at lease one document set on the first document table" and a "second document detector" that detects a document set on the second document table. (Doc. 60-4, 10:5–16). Claim 1 is silent as to the capability of the second document detector to detect whether the document extends beyond the second document table. Claims 2 and 11, being dependent claims, refer to Claim 1 and further define

and narrow the thing claimed in Claim 1 by adding a new capability or functionality—the ability to detect the size of the document.

The rules of construction are clear: the "claims themselves provide substantial guidance as to the meaning of particular claim terms" and yet "the do not stand alone . . . and must therefore 'be read in view of the specification.'" *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019). Similarly, the prosecution history, when available, "provides evidence of how the [United States Patent and Trademark Office ("PTO")] and the inventor understood the patent." *Id.* The Federal Circuit cautions, however, that the prosecution history reflects an "ongoing negotiation between the PTO and the applicant" and often lacks the clarity of the specification. *Id.* And use of the phrase "present invention" or "this invention" is not always limiting, particularly where the "references . . . are not uniform, or where other portions intrinsic evidence do not support applying the limitation to the entire patent." *Id.* at 798.

While the "Summary of the Invention," including embodiments, provides for the capability to both detect the presence and size of a document on the second document table, the invention is not limited to the capability to detect both presence and size of a document. Here, the sole independent claim does not limit the invention to one where the second document detector has the several capabilities identified in the embodiments and the dependent claims. Rather, Claim 1 is broad and informs a document detector that detects the presence of a

document—not its presence and its size. The Court declines to import limitations contained in the dependent claims into Claim 1, the sole independent claim.

The Defendants' reliance on the prosecution history is similarly unconvincing. As the Plaintiff observes in its pleading, the Office Action contains statements by the Examiner, not disavowing statements by the Applicant. Even if one considers the Examiner's statements as indicative of how a person of ordinary skill in the art may understand the term, the Examiner's reliance on "Kazuhiro" supports the Plaintiff's argument that the second document detector, as found in Claim 1, detects the *presence* of a document and not its size. (Doc. 60-8, p. 4) ("Kazuhiro discloses an image reader, Drawing 2, comprising: . . . a second document detector for detecting a document set on the second document table (a book manuscript sensor, Drawing 2/13, is for detecting the book manuscript was laid on . . ."). And the Examiner's reliance on "Matsuo" addresses the limitations found in Claim 11 pertaining to the size and position of the document:

> With reference to claim 11 (depends on claim 1), . . . Kazuhiro is silent as to the following disclosed by Matsuo.
>
> the first document detector and the second document detector are used to detect the sizes of the documents set on the first and second document tables . . .

(*Id.* at pp. 7–8).

For these reasons, the term "document detector" or "second document detector" as found in Claim 1 do not require detection of the size and position of the document and require only the capability of detecting the *presence* of a document. The Court will adopt the Plaintiff's proposed construction of "document

detector" as "device that can detect the presence of a document." The remainder of the term does not require construction and shall be afforded its plain and ordinary meaning. Accordingly, the Court declines the Defendants' invitation to provide a separate construction to the term "a second document detector for detecting the another document set on the document table."

   **DONE AND ORDERED** in Orlando, Florida on November 30, 2022.


PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties